IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

TREVELLE ALEXANDER WINN,
    Plaintiff,

v.                            Civil Action No. 3:24cv262

SHERIFF ANTIONETTE IRVING, *et al.*,
    Defendants.

## OPINION

On April 15, 2023, the plaintiff, Trevelle Alexander Winn, a pretrial detainee housed at the Richmond City Justice Center ("RCJC"), incurred injuries after a fight broke out among inmates over a TV remote. On April 11, 2024, Winn sued the defendant, Sheriff Antionette Irving, under 42 U.S.C. § 1983 for violating Winn's Eighth Amendment right to protection (Count I), for supervisory liability (Count II), and for manifesting a policy or custom that violated Winn's Fourteenth Amendment rights (Count III). Winn also sued Irving and the other defendants, Deputies John Doe 1-20, for state law claims of gross negligence (Count IV) and willful and wanton negligence (Count VI), and for vicarious liability and *respondeat superior* (Count V). Winn also asks for punitive damages (Count VII).

Irving filed a motion to dismiss on August 16, 2024.[1] The Court denied the motion to dismiss because Winn asserted enough factual allegations to support the claims. On February 17, 2025, Irving moved for summary judgment. Because Winn fails to show that Irving violated his

---

[1] Winn subsequently filed a request for entry of default against Irving on August 19, 2024, because Irving did not timely file a responsive pleading. The Court denied the request and the subsequent motion to reconsider because the United States Court of Appeals for the Fourth Circuit prefers that courts dispose "of claims on their merits." *United States v. Moradi*, 673 F.2d 725, 727 (4th Cir. 1982); *see also Tazco, Inc. v. Dir., Off. of Workers Comp. Programs, U.S. Dep't of Lab.*, 895 F.2d 949, 950 (4th Cir.1990) ("The law disfavors default judgments as a general matter.")

constitutional rights, the Court will grant summary judgment on all of Winn's § 1983 claims in favor of the Sheriff. Similarly, the record does not support Winn's gross negligence, willful and wanton negligence, and supervisory liability/*respondeat superior* claims.[2] The Court will, therefore, grant the motion for summary judgment in favor of Irving.

## I. MATERIAL FACTS[3]

### A. RCJC Layout and Staffing

Irving is the sheriff for the City of Richmond. (ECF No. 38-1, at 6.)[4] Part of her duties as sheriff involve overseeing RCJC operations and the staff that work there. (*Id.* at 14–15.) RCJC has six floors, all of which house inmates, and has three mental health pods for male inmates. (*Id.* at 41–43.) Winn lived in Pod 3F, one of the mental health pods. (*Id.* at 43.) RCJC has body

---

[2] Count VII, Winn's last claim, asks for punitive damages. That is a request for relief, not an independent cause of action, and as a result, the Court will not analyze it as a standalone claim. *Menerick v. Salem Heritage, LLC*, No. 1:23cv00010, 2023 WL 3818391, at *4 (W.D. Va. June 5, 2023) (explaining that there "is no support in Virginia law for an independent cause of action for punitive damages"). But because the Court is granting judgment in favor of the defendants on all other claims, the Court will not award Winn punitive damages.

[3] "In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." Loc. Civ. R. 56(B).

Further, the Court does not have the responsibility to "comb through the record in search of facts relevant to summary judgment." *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017). In his brief in opposition, Winn fails to support many of his disputed facts with record citations. To the extent that the Court could find the support based on Winn's later citations in other areas of his brief, the Court reviewed the evidence to resolve the dispute. But where the Court could not find Winn's purported evidence through other citations, or where Winn cited to whole hundred-page exhibits for the Court to sort through, (*see* ECF No. 48, at 10 (citing "Exhibit 3," a 182-page document)), the Court is not required to consider those assertions.

[4] All record citations identify the documents and page numbers using ECF numbers and the page numbers assigned by the CM/ECF system. Where the CM/ECF system does not assign page numbers, the cites reflect the original page numbers of the documents.

scanners on each floor to detect contraband, and deputies conduct "shakedowns" of the inmates in which they check the inmates' cells, clothing, and bodies to detect any contraband. (*Id.* at 33, 75–76.) RCJC also has a Master Control center, the "most critical control point in [RCJC]," which has at least one deputy assigned to it 24 hours a day. (*Id.* at 48; ECF No. 38-2, at 5.) The deputy in Master Control can operate all the doors within RCJC. (ECF No. 38-1, at 47.)

Since 2018, RCJC has been "staff challenged," and Irving "would like to have more people, as all other agencies would." (ECF No. 48-7, at 20.) The staffing problem started when the previous sheriff left office and Irving took control. (ECF No. 48-5, at 56.) Speaking specifically to the fifth and sixth floors of RCJC, which does not include Pod 3F, Sergeant James Jones,[5] an employee of RCJC since 2014, indicated that having only two deputies and one sergeant for a floor of eight pods makes it difficult for staff to do their jobs. (*Id.* at 53.) To rectify the understaffing situation, RCJC has "upped" recruitment and advertising for staff through television commercials, "advertisements in shopping centers," "bulletin boards on the highway," wrapped vehicles with recruitment information, and job fairs. (ECF No. 48-7, at 21–22.)

### B. Supervision Models

RCJC employs both direct and non-direct models of inmate supervision. (ECF No. 38-1, at 62–64.) Direct supervision occurs when deputies always remain in a pod with the inmates. (*Id.*

---

[5] Irving opposes Winn's reliance on Jones's testimony because Jones was deposed for the related case of *Wade v. Irving, et al.*, Case No. 3:24cv291 (E.D. Va.), and does not have personal knowledge of the staffing on Pod 3F or the events that occurred on April 15, 2023, making his testimony not relevant. At the outset, the Court consolidated discovery for this case and the *Wade* case. Additionally, under Federal Rule of Evidence 401, evidence is relevant if it makes a fact more or less probable and the fact is "of consequence"—a low threshold. The Court acknowledges that Jones does not have any knowledge about Winn, Pod 3F, or the incident on April 15, 2023, but he does have knowledge of staffing problems since Irving took over as sheriff. This evidence tends to make the fact more probable that RCJC as a whole was understaffed, which is of consequence to whether Winn suffered a substantial risk of harm. The Court, therefore, will consider Jones's deposition here.

at 63–64.)  At the time of the incident, RCJC staff directly supervised pods 1D, 3A, 4A, and 5A.

(ECF No. 38-3, at 5.)  Conversely, non-direct supervision occurs when deputies monitor all the

pods on a specific floor of RCJC by video feed rather than assigning deputies to physically monitor

inmates in the pods themselves.  (ECF No. 38-1, 62–63, 68–69.)  Under this model, one deputy

watches the inmates from video feeds at duty station desks on each floor, while one to two other

deputies move in and out of pods twice an hour to conduct security checks.  (*Id.* at 68–69, 83–84;

ECF No. 38-2; ECF No. 38-3, at 5.)  The deputy stationed at the duty station desks can control all

the doors to the pods and within the pods.  (ECF No. 38-1, at 66.)

    RCJC was originally designed and built with the direct supervision model in mind.[6]  (ECF

No. 48-6, at 17.)  Before Irving became sheriff, Sheriff Woody used a direct model of supervision

---

[6] These facts come from Sheriff Clarence T. Woody, Jr.'s deposition, who served as Sheriff
for the City of Richmond from 2005–2017.  (ECF No. 48-8, at 9.)  In her reply brief, Irving asserts
that Woody's deposition testimony is inadmissible at trial for two reasons.  *See Giles v. Nat'l R.R.
Passenger Corp.*, 59 F.4th 696, 704 (4th Cir. 2023) (explaining that a court "may not consider
inadmissible evidence on a motion for summary judgment").  First, because Woody bases his
testimony on his professional experience as a sheriff, it amounts to expert testimony.  Because
Winn did not designate Woody as an expert, she argues he may not rely on this testimony.  (ECF
No. 51, at 3; ECF Nos. 41, 42.)  Second, Irving asserts that Woody's testimony is not relevant
because his testimony is not based on RCJC's operations under Irving's tenure.  (ECF No. 42, at
1.)

    Federal Rule of Evidence 701 limits lay testimony to opinions that are "(a) rationally based
on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to
determining a fact in issue; and (c) not based on scientific, technical, or other specialized
knowledge within the scope of Rule 702."  There is a "fine line" between Rule 701 lay witness
testimony and Rule 702 expert witness testimony.  *United States v. Denton*, 944 F.3d 170, 185 (4th
Cir. 2019).  "[L]ay opinion testimony *must* be based on personal knowledge" while expert
testimony may include "firsthand observation and experience."  *United States v. Perkins*, 470 F.3d
150, 155–56 (4th Cir. 2006).  For example, in the context of law enforcement, an officer moves
into expert testimony when their testimony "is not based on personal perception, but rather on law
enforcement experience and after-the-fact investigation."  *Denton*, 944 F.3d at 185.

    Here, Winn claims that Woody has "personal observations and knowledge from his on-the-
job experience" regarding jail operations and security procedures.  (ECF No. 50, at 3.)  Woody
does have personal knowledge of how RCJC was structured, designed, and built because he was

at RCJC. (ECF No. 48-6, at 14.) RCJC first implemented its non-direct supervision model starting in late 2021 to early 2022, under Irving's tenure. (ECF No. 38-1, at 82.) Although the Virginia Administrative Code's minimum standards for jails and lockups allow for non-direct models of supervision, (ECF No. 38-18, at 12), Woody testified that a non-direct supervision model is "very dangerous" for staff and "extremely dangerous" for inmates because the inmates have "no supervision" and are "in control" of the pods, (ECF No. 48-6, at 15–16).

### C. Security Policy

RCJC's Policy 202 governing security operations ("the Security Operations Policy") outlines the building security protocol and the protocol for Pod 3F. (ECF No. 38-2, at 3.) Regarding Pod 3F and a variety of other pods, the policy states that "[a]t least one (1) deputy will be assigned to this housing area, as a permanent post and is responsible for security checks."[7] (*Id.*) Although Sergeant Keishawn Cain asserts in her testimony that RCJC's supervision policy

---

involved in that process. (ECF No. 48-6, at 17.) That testimony is admissible as lay testimony. But, beyond Winn's conclusory statement about Woody's personal observations regarding supervision models at RCJC, Winn fails to describe what those observations are that keep Woody's testimony in the realm of lay testimony instead of crossing the line into expert testimony that is based on Woody's job experience. Yet, the standard on a motion for summary judgment requires the Court to view the facts "in the light most favorable to the nonmoving party." *Somers v. Devine*, 132 F.4th 689, 695 (4th Cir. 2025). Additionally, Woody's testimony regarding supervision models is relevant to determine whether a substantial risk existed in using the non-direct supervision model at RCJC. *See* Fed. R. Evid. 401 (evidence is relevant if it tends to make a fact more or less probable and the fact is "of consequence.")

For the purposes of summary judgment, then, the Court will consider Woody's cited deposition testimony. For the reasons in this Opinion, however, the Court will enter judgment in favor of Irving even after considering Woody's testimony.

[7] The parties dispute the meaning of this provision. Winn argues that the policy states that a deputy must be stationed within Pod 3F at all times. (ECF No. 48, at 9.) Irving asserts that the policy does not state such a thing, and that the policy of the Sheriff's Office does not require direct supervision in all pods. (ECF No. 51, at 5–6.) Because the policy is ambiguous based on the actual language regarding Pod 3F compared with that of other pods, the Court views the policy in the light most favorable to the nonmoving party, the plaintiff here.

employs a non-direct supervision model for most pods, including Pod 3F, (ECF Nos. 38-2, at 3–4; 38-3, at 5; ECF No. 48-9, at 35), Cain admitted that the written policy seems to indicate that a deputy should permanently be posted inside the pod. (ECF No. 48-9, at 35).

Pod 3F, like other pods, has a security desk in it. (*Id.* at 27.) Red tape on the floor surrounds the desk, indicating a line that the inmates cannot cross. (*Id.*) At some point in time, the desk had a computer station where a deputy would sit at the desk to monitor the pod. (*Id.* at 27–28.) During Irving's tenure, when RCJC no longer had deputies stationed in every pod, RCJC removed the computers from the desks when inmates broke them and to prevent the inmates from accessing the RCJC control systems from the computer.[8] (*Id.* at 65–66.)

### D. Deputy Training[9]

When new deputies start working at RCJC, they must participate in several different types of training. (ECF No. 38-4, at 3.) The first ten days of a new hire's position consist of onboarding during which the new deputy receives classroom-style instruction on direct supervision, non-direct supervision, "de-escalation techniques, crisis intervention, emergency response procedures, and mental health." (*Id.* at 4.) The new deputy then shadows an experienced deputy and learns the day-to-day tasks of the job, including interacting with inmates, performing security checks, and

---

[8] Winn avers that Irving testified that the computer stations inside the pod "were removed during her tenure due to understaffing." (ECF No. 48, at 4.) But the record does not support that allegation. Rather, Irving testified that they removed the computers for the two reasons mentioned here. (ECF No. 48-7, at 65.)

[9] Winn argues that the testimony from a Deputy Jeffrey Ceus "highlights a critical gap in training regarding non-direct supervision" at RCJC because Ceus could not articulate what the non-direct supervision model required. (ECF No. 48, at 7.) While true that Ceus did not know how to respond when Winn's attorney asked what the non-direct supervision model entails, (ECF No. 48-10, at 53–55), Ceus's other testimony shows that he knows how to perform non-direct supervision on-the-job, (ECF No. 48-10, at 11). The Court, therefore, does not consider Ceus's testimony to support Winn's assertions that deputies were poorly trained, as Ceus knew how to do the job, albeit not the proper terminology for the job he was doing.

handing out medicine with the medical staff. (*Id.*) At some point during the first year on the job, all deputies go to the Virginia Justice Center Training Academy ("the Academy") for twelve to thirteen weeks to receive jailer certification and civil process training. (*Id.*) After graduating from the Academy, the deputies participate in one more week of field training, where they try out different positions within RCJC and learn how to transport inmates and do "civil process." (*Id.* at 4–5.) Deputies also participate in further in-service trainings on topics that the supervisors feel need to be refreshed, such as defensive training, crisis management, and direct and non-direct supervision. (*Id.* at 5.)

The Virginia Department of Corrections ("VADOC") audits RCJC for compliance and safety, with the last two audits occurring on September 27, 2022, and February 9, 2023. (*Id.*) During those audits, VADOC found RCJC 100% in compliance with the applicable standards, including deputy training. (*Id.* at 5, 12–42.)

### E. The Incident

Winn first entered custody at RCJC on December 9, 2022, for "pre-trial release violations, simple assault on law enforcement officers, and a weapons possession charge." (ECF No. 38, at ¶ 14; *see* ECF No. 38-6, at 16.) During the intake process, Winn told an RCJC doctor that he had a history of various mental illnesses. (ECF No. 38-6, at 16.) Because of his mental health disorders, RCJC housed Winn in a mental health pod. (*Id.* at 17.) Winn got in a fight with an inmate in his first pod, and he moved twice until he ended up in mental health Pod 3F. (ECF No. 38-9, 2–4.) Winn did not have a cellmate in his Pod 3F cell. (ECF No. 1, at 3.) His cell had an intercom button inside to call deputies if needed, and RCJC also had intercom buttons stationed inside Pod 3F by the recreational area and the entrance doors. (ECF No. 38-6, at 23.)

7

On April 15, 2025, around 3:30 p.m., Winn sat in the recreational area of Pod 3F watching TV with other inmates. (*Id.* at 20.) At one point, Winn got up to use the bathroom in his cell but took the remote with him. (*Id.*) Another inmate came to Winn's cell while he used the bathroom and told Winn that other inmates planned to harm Winn. (*Id.*) Winn finished in the bathroom and returned to the common area, but did not use the intercom in his cell to report the threat to deputies. (*Id.* at 20, 23.)

Once back in the common area, Winn argued[10] with three other inmates, Jaquan Jones, Rondell Davis, and Michael Johnson, for approximately four and a half minutes. (*Id.* at 30–31; ECF No. 38-16, at 2:51–7:25.) During the argument, Winn did not press any intercom button for help, though he admits that he could have. (ECF No. 38-6, at 30.) Around 3:33 p.m., Winn, Jones, Davis, and Johnson got into a physical fight, during which Winn got stabbed. (*Id.* at 31; ECF No. 38-16.) Before this incident, Winn did not have any issues with Jones, Davis, or Johnson. (ECF No. 38-6, at 21.) Winn had also never reported to deputies or Irving that he felt unsafe in Pod 3F. (*Id.* at 21, 40.)

### F. Deputy Response

On the day of Winn's incident, RCJC did not have deputies physically stationed within Pod 3F itself, (ECF No. 38-11, at 17–18), but had assigned three people to staff the third floor: Cain, Corporal Rachelle Brown, and Deputy Leteia Sheppard. (ECF No. 38-12, at 2.) A fourth staff member, Deputy Nita Coles, also conducted security checks of Pod 3F that day. (ECF No. 38-15, at 2.) Before the fight, deputies conducted security checks of Pod 3F at 7:07 a.m., 7:38

---

[10] Irving asserts that Winn confronted the three inmates at issue when he returned to the common area from the bathroom. (ECF No. 38 ¶ 24.) But Irving's citations to Winn's deposition testimony do not support such a claim. Winn stated that he went to return the remote after using the bathroom and all four inmates, Winn included, got into an argument with each other. (ECF No. 38-6, at 23, 30.)

a.m., 8:03 a.m., 8:46 a.m., 9:13 a.m., 9:40 a.m., 10:12 a.m., 10:14 a.m.,[11] 11:03 a.m., 11:32 a.m.,

12:09 p.m., 12:40 p.m., 1:06 p.m., 1:47 p.m., 2:12 p.m., 2:45 p.m., and 3:20 p.m.[12] (ECF Nos. 38-

13; 38-15.) The sergeant assigned to the third floor that day, Cain, sat at the duty desk outside of

the pod at the time of the fight. (ECF No. 38-11, at 17.) Cain saw the fight break out on the

security cameras, radioed for deputies to respond, and responded to the fight herself. (ECF No.

38-17, at 2; ECF No. 38-14, at 3.) Thirty seconds after Cain radioed the deputies, one deputy ran

to the elevator to respond. (ECF No. 38-17, at 2; ECF No. 38-16, at 8:02.) Approximately one

minute and fifteen seconds after the fight started, several deputies entered Pod 3F and broke up

the inmates. (ECF No. 38-16, at 8:40.) The deputies locked down the pod, checked on Winn's

---

[11] The housing activity log, (ECF No. 38-13, at 5), reflects a security check time of either 10:14 a.m. or 10:44 a.m., but the handwriting is unclear. Irving's list of undisputed facts cites the correct time as 10:14 a.m., (ECF No. 38, at 8), though 10:44 a.m. is more consistent with the fact that security checks seem to occur approximately every half hour.

[12] Winn contends that a Board of Local and Regional Jails ("BLRJ") investigation found discrepancies between times of the rounds that deputies charted and the actual times that those rounds occurred. (ECF No. 48, at 4.) Winn does not provide the BLRJ report in the record. According to Irving's deposition testimony, BLRJ conducted an investigation of three deaths that had occurred at RCJC on different dates. (ECF No. 48-7, at 88–89.) Two of those deaths are the subject of suit against Irving before this Court in *Wade v. Irving, et al.*, No. 3:24cv291 (E.D. Va.), and *Meredith v. Irving et al.*, No. 3:24cv709 (E.D. Va.). The Court thus takes judicial notice that one of the inmates died on December 12, 2022, and the other on January 11, 2023.

According to Irving, BLRJ found that, on the dates of those deaths, discrepancies existed between the times that deputies actually conducted rounds and the times written in the logs. (ECF No. 48-7, at 88–91.) Irving signed the BLRJ report on November 15, 2023. (*Id.* at 86.) Following the BLRJ report, RCJC retrained its staff on security checks and introduced an electronic system to keep track of timing for security checks. (*Id.* at 91–92.) Because Winn's incident occurred on April 15, 2023, after the deaths but before the BLRJ report and re-training of staff, it is possible that the logs regarding rounds on April 15, 2023, also contain discrepancies. But, without the report in the record, the Court cannot assess the extent of any discrepancies or when they may have occurred. And, because the record shows that Irving did not know of the discrepancy issue until the BLRJ report in November 2023, the Court will not impute knowledge on Irving of any issues in the timing of rounds on April 15, 2023.

injuries, and escorted Winn to the medical unit. (ECF No. 38-6, 33–34.) The deputies then conducted a shakedown of Pod 3F for contraband. (ECF No. 38-15, at 2.)

## II. DISCUSSION[13]

### A. § 1983 Failure to Protect Claim (Count I)

#### 1. Legal Standard

Section 1983 "provides a method for vindicating federal constitutional . . . rights" when a person acting under the color of law violates those rights. *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016). Winn asserts a § 1983 failure to protect claim against Irving, arguing that the Eighth Amendment generally requires prison officials to "take reasonable measures to guarantee the safety of the inmates." *Cox v. Quinn*, 828 F.3d 227, 235 (4th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). While the Eighth Amendment does require such protection for convicted prisoners, pretrial detainees like Winn must seek § 1983 relief under the Fourteenth Amendment's Due Process Clause. *See Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023). The Court, therefore, will analyze Winn's failure-to-protect claim as if he alleged the claim under the Fourteenth Amendment in his complaint.

---

[13] Pursuant to Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'A fact is material if it might affect the outcome of the suit under the governing law.' A dispute is 'genuine' if 'a reasonable jury could return a verdict for the non-moving party.'" *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022) (citation omitted) (first quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013); and then quoting *Strothers v. City of Laurel*, 895 F.3d 317, 326 (4th Cir. 2018)).

Upon a motion for summary judgment, the court draws all reasonable inferences in the nonmoving party's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and views the facts "in the light most favorable to the nonmoving party," *Somers*, 132 F.4th at 695. But when the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing "affidavits" or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

### a. The Evolution of a Fourteenth Amendment Deliberate Indifference Claim

Prior to the Fourth Circuit's decision in *Short*, 87 F.4th 593, the Fourth Circuit applied the same two-part test in a failure to protect claim alleged by convicted persons under the Eighth Amendment as that for pretrial detainees under the Fourteenth Amendment. The deliberate indifference test required the plaintiff to demonstrate (1) that he was subjected to an objective, substantial risk of serious harm and (2) that the person acting under color of law subjectively recognized and disregarded the risk of harm. *See Younger v. Crowder*, 79 F.4th 373, 382 (4th Cir. 2023); *Stevens v. Holler*, 68 F.4th 921, 931 (4th Cir. 2023); *Michelson v. Coon*, No. 20-6480, 2021 WL 2981501 at *3 (4th Cir. Jul. 15, 2021) (applying the standard in a failure to protect claim).

The Fourth Circuit overturned this precedent in *Short*, however, holding that a pretrial detainee's deliberate indifference claim under the Fourteenth Amendment is "solely an objective one." 87 F.4th at 609 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015)). Clarifying further, the Fourth Circuit explained, "[t]he objective test we adopt today differs from our prior subjective test in one respect only. The plaintiff no longer has to show that the defendant had actual knowledge . . . and consciously disregarded the risk." *Id.* at 611. The Fourth Circuit did not alter the first prong of the two-part test, however, which remains the same as that for an Eighth Amendment claim: the plaintiff must first show that the defendant "exposed him 'to an objectively substantial risk of serious harm.'" *Carmona v. Martin*, No. 23-6930, 2024 WL 4490695 at *2 (4th Cir. Oct. 15, 2024) (quoting *Younger*, 79 F.4th at 382).

### b. First Prong: Substantial Risk of Harm

Not every injury "suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 831. In asserting a § 1983 failure to protect claim for an attack by another inmate, the plaintiff

first must have suffered "a serious deprivation of rights in the form of serious or significant physical or emotional injury." *Danser v. Stansberry*, 772 F.3d 340, 346 (4th Cir. 2014); *see Prigg v. Balt. Cnty. Dep't of Corr.*, No. DLB-23-48, 2024 WL 1012885, at *5 (D. Md. Mar. 8, 2024) (applying the standard to a Fourteenth Amendment failure to protect claim). In lieu of a serious injury, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. To determine this, the court must conduct an objective inquiry to "'assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.'" *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).

### c. Second Prong: Deliberate Indifference

For the second part of the failure-to-protect claim, the plaintiff must demonstrate the defendant's "deliberate indifference to a serious risk of harm on the purely objective basis that the 'governmental action' [that the plaintiff challenges] is not 'rationally related to a legitimate nonpunitive governmental purpose' or is 'excessive in relation to that purpose.'" *Short*, 87 F.4th at 611 (quoting *Kingsley*, 576 U.S. at 398). As discussed earlier, the deliberate indifference test under a Fourteenth Amendment claim is "solely an objective one." *Id.* at 609; *see Hammock v. Andoh*, No. 22-7159, 2024 WL 33694 at *1 (4th Cir. Jan. 3, 2024) ("[A] pretrial detainee's failure-to-protect claim must be evaluated under an entirely objective standard."). To demonstrate deliberate indifference for a Fourteenth Amendment claim, then, "it is enough that the plaintiff show that the defendant acted or failed to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Short*, 87 F.4th at 607 (internal citation omitted).

2. *Analysis*

a. *Substantial Risk of Harm*

In his complaint, Winn argues that he faced a serious risk of harm[14] because RCJC was

understaffed and used a non-direct model of inmate supervision.[15] The question, then, is whether

a genuine dispute of material fact exists that RCJC's understaffing and non-direct supervision

model posed a substantial risk of serious harm such that "society" would consider the conditions

"so grave" that it would not "expose *anyone* unwillingly to such a risk." *Raynor*, 817 F.3d at 127;

*see Farmer*, 511 U.S. at 834. The record creates such a dispute of material fact.

To support his understaffing claim, Winn cites Irving's deposition testimony that RCJC

has been "staff challenged," (ECF No. 48-7, at 20), and Jones's deposition testimony about the

difficulties of understaffing he experienced on the fifth and sixth floors of RCJC, (ECF No. 48-5,

at 53). Irving presents RCJC evidentiary records and declarations by staff that show that four

people staffed the third floor of RCJC, which includes Pod 3F, during the relevant shift on the day

of Winn's incident. (ECF Nos. 38-12, 38-14, 38-15, 38-17.) Based on (1) Jones's testimony that

three staff members covering a floor created difficulties and potentially unsafe measures for

---

[14] While a plaintiff can show serious physical injury to meet this element, few facts exist in the briefing and summary judgment exhibits presented by the parties about the injuries Winn sustained from the fight. Neither party speaks of Winn's injuries or any resulting medical care beyond the fact that he went to the medical unit after the fight. In a separate motion *in limine*, Irving moved to exclude the medical bills that Winn incurred for his medical treatment at VCU following the incident in this matter. (ECF No. 46.) Winn, therefore, may have suffered serious harm from the incident. (*See* ECF No. 57-1.) But, because the parties focus their summary judgment arguments on substantial risk of harm rather than serious harm, the Court does also. Regardless of whether the Court analyzed this first prong under serious risk of harm or serious injury, Winn fails to meet the deliberate indifference prong of his failure-to-protect claim.

[15] Winn also asserts that removing the deputy stations and monitoring equipment from the pods created a risk of harm, but, as the record shows, removing the monitoring equipment was part of RCJC's shift to non-direct supervision.

inmates, and (2) the evidence that Winn's floor only had four people covering it on the day of the incident, a reasonable person could find a substantial risk of harm created by understaffing.

Regarding the method of inmate supervision, the record supports the conclusion that a reasonable person might find that a non-direct supervision model is such a risk that "society" would consider the conditions "so grave" that it would not "expose *anyone* unwillingly to such a risk." *Raynor*, 817 F.3d at 127. The Virginia Administrative Code's minimum standards for jails and lockups allow for such a model of supervision. (ECF No. 38-18, at 12); *see* 6 VAC 15-40-1045. And at least one court has found that the non-direct supervision model does not violate constitutional protections to keep inmates safe. *See Dockery v. Hall*, 443 F. Supp. 3d 726, 746–47 (S.D. Miss. 2019), *aff'd*, 7 F.4th 375 (5th Cir. 2021) (holding that the non-direct supervision model at that jail did not create a substantial risk of harm and that the defendants were not deliberately indifferent to prisoner-on-prisoner violence). Sheriff Woody, however, testified that the non-direct supervision model is "extremely dangerous"[16] for inmates. (ECF No. 48-6, at 15–16.) A reasonable juror, therefore, may find that RCJC's conditions at the time of Winn's incident created a substantial risk of harm.

But the inquiry does not end there. To survive a defendant's motion for summary judgment, a plaintiff must show a genuine dispute of material fact for each element of a claim that they bear the burden of proof on at trial. *See Celotex Corp.*, 477 U.S. at 322–23 (1986) ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case."); *Banca Cremi S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1027 (4th Cir. 1997) ("A factual issue raised by

---

[16] Because Winn asserts that Woody has personal knowledge of the dangerousness of a non-direct supervision model, though he does not support that claim otherwise, and the Court must view the facts in the light most favorable to Winn here, the Court considers Woody's testimony.

the [plaintiff] is only genuine if a reasonable jury could return a verdict for the [plaintiff] on each element necessary to its case."). As the party with the burden of proof at trial, it is not enough for Winn to only create a genuine dispute of material fact as to this first element of his failure to protect claim to defeat summary judgment. The Court, therefore, considers the next element of Winn's failure to protect claim.

### b. Deliberate Indifference

As the party with the burden of proof at trial, it is not enough for Winn to only create a genuine dispute of material fact as to one element of his claim. *See Celotex Corp.*, 477 U.S. at 322–23 (1986) ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case."). The question for this second prong asks whether, objectively, Irving failed to act in the face of an "unjustifiably high risk of harm that is either known or so obvious that it should be known." *Short*, 87 F.4th at 607. Winn asserts that RCJC's understaffing and use of the non-direct supervision model creates such a risk of harm. He also states that Irving's "office had knowledge—through past incidents, jail conditions, or inadequate supervision—of a substantial risk of harm in Pod 3F." (ECF No. 48, at 17.)

First, conflicting views exist about the risks posed by the non-direct supervision model. The Virginia Administrative Code allows for non-direct supervision, and at least one United States District Court has found that it is not dangerous. *See* 6 VAC 15-40-1045; *Dockery*, 443 F. Supp. 3d at 746–47. But Woody testified otherwise. (ECF No. 48-6, at 15–16.) These conflicting opinions establish that, though a risk may have existed, it was neither "known" or "so obvious that it should be known" sufficient to establish that Irving acted with deliberate indifference. *Short*, 87 F.4th at 607.

Second, Winn only presents evidence that understaffing occurred but does not provide evidence that Irving did not act to rectify the situation or acted indifferently to it. Rather, Irving's testimony shows that Irving and RCJC have tried several recruitment strategies to attract potential staff: television commercials, "advertisements in shopping centers," "bulletin boards on the highway," wrapped vehicles with recruitment information, and job fairs. (ECF No. 48-7, at 21–22.) Such strategies demonstrate an active effort to increase staffing, not a failure to act in the face of these purported risks. No evidence exists, then, that Irving acted with deliberate indifference to staffing shortages.

Third, Winn highlights that Irving's "office had knowledge—through past incidents, jail conditions, or inadequate supervision—of a substantial risk of harm in Pod 3F." (ECF No. 48, at 17.) But Winn does not introduce any evidence that Irving's office knew about a pattern of incidents that created a risk of harm in Pod 3F. Nothing in the record that the parties present shows any pattern of past incidents, poor jail conditions, or inadequate supervision in Pod 3F.[17] Thus, objectively, Irving did not act with deliberate indifference to the risks that Winn asserts here.

Finally, addressing the specific events on April 15, 2023, neither Irving nor any of the staff at RCJC acted with deliberate indifference to potential danger between Winn and the three inmates that fought him. Winn and those inmates had never had problems with each other before. Winn never reported to RCJC staff that he felt unsafe while at RCJC. And Winn did not alert the staff that day of any issues: he did not use either his cell's intercom or the common room intercom to

---

[17] The evidence relied on by the parties regarding Pod 3F involves Winn's transfer to Pod 3F from a different pod, the events of the fight on April 15, 2023, the security camera footage of the fight, the RCJC logs regarding times of security checks for Pod 3F, and the Security Operations Policy that speaks to staffing of Pod 3F. But Winn does not present any evidence suggesting that RCJC deputies inadequately supervised Pod 3F previously or that other incidents that occurred in that pod that would create a risk of harm known to the defendant(s).

16

reach out to deputies for help, even when he knew of the threat and could have done so at least twice before the physical fight broke out. Irving, therefore, did not act with deliberate indifference to Winn's safety that day.

Because Winn "fails to make a showing sufficient to establish the existence of an element essential to [his] case," the Court will grant summary judgment for Irving on Count I. *See Celotex Corp.*, 477 U.S. at 322–23 (1986).

### B. § 1983 Supervisory Liability Claim (Count II)

"Supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Johnson v. Robinette*, 105 F.4th 99, 123 (4th Cir. 2024) (quoting *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994)). The elements of a § 1983 supervisory liability claim require the plaintiff to prove:

> (1) that the supervisor had actual or constructive knowledge that [her] subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff;
>
> (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and
>
> (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* (quoting *Shaw*, 13 F.3d at 799).

At a minimum, Winn does not demonstrate a constitutional injury that satisfies the third factor of a § 1983 supervisory liability claim. Winn's sole basis for supervisory liability is that the deputies should have abided by the direct supervision model rather than the non-direct supervision model. He asserts that RCJC's Security Operations Policy requires deputies to be stationed within the pods at all times and, because the deputies did not do this, Irving is responsible for the risk of harm created by not enforcing the policy.

At best, the Security Operations Policy is ambiguous as to whether it requires deputies to employ a direct supervision model for Pod 3F. (ECF No. 48-2, at 1–3.) But, even viewing the evidence in the light most favorable to Winn—that is, that the policy requires a direct supervision model—a "violation of departmental policy does not equate with constitutional unreasonableness." *Abney v. Coe*, 493 F.3d 412, 419 (4th Cir. 2007); *see Jackson v. Sampson*, 536 F. App'x 356, 357 (4th Cir. 2013) (per curiam) (holding that "prison officials' failure to follow internal prison policies are not actionable under § 1983 unless the alleged breach of policy rises to the level of a constitutional violation.") And Winn does not assert that the individual deputies did something specific to violate his constitutional rights, other than perform their duties using the non-direct supervisory model. Additionally, the Court has already found that Irving and the staff did not fail to protect Winn under the Fourteenth Amendment because they did not act with deliberate indifference. Without a constitutional harm, Winn cannot succeed on a § 1983 supervisory liability claim. Accordingly, the Court will grant summary judgment on Claim II in favor of Irving.

### C. Monell Claim (Count III)

"To make out a case for departmental liability under [*Monell*], [a plaintiff] must show both that he has suffered a constitutional harm and that the harm was the result of the Department's unconstitutional policy or custom." *English v. Clarke*, 90 F.4th 636, 649 (4th Cir. 2024) (citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658 (1978)); *see Covenant Media of SC, LLC v. City of N. Charleston*, 493 F.3d 421, 436 (4th Cir. 2007) (explaining that, to prove a *Monell*

claim, the plaintiff must show that (1) their harm "was caused by a constitutional violation," and (2) that "the city is responsible for that violation").

In support of his *Monell* claim, Winn argues that he suffered a constitutional violation "due to Sheriff Irving's deliberate indifference" because the deputies followed the non-direct supervision model. (ECF No. 48, at 22.) But, as the Court already explained, Irving's actions and the use of the non-direct supervision model does not amount to a deliberate indifference to a serious risk of harm. Because a *Monell* claim requires a constitutional violation and the record does not support one, the Court will grant the motion for summary judgment as to Count III.

### D. Gross Negligence (Count IV)

To prove gross negligence in Virginia, the plaintiff must demonstrate "a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Commonwealth v. Giddens*, 295 Va. 607, 613, 816 S.E.2d 290, 294 (2018) (quoting *Cowan v. Hospice Support Care, Inc.*, 268 Va. 482, 487, 603 S.E.2d 916, 918 (2004)). "[A] claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Elliott v. Carter*, 292 Va. 618, 622, 791 S.E.2d 730, 732 (2016). Even ineffectual or inadequate efforts may meet the required degree of care, provided the efforts "were not so insufficient as to constitute the indifference and utter disregard of prudence that would amount to a complete neglect for [an individual's] safety." *Id.* at 623, 733.

Irving and her staff did not act with gross negligence for the same reasons that Irving did not act with deliberate indifference in the failure-to-protect claim. Nothing in the record supports that Irving completely disregarded Winn's care such that she "complete[ly] neglect[ed]" Winn's safety. *Giddens*, 295 Va. at 613, 816 S.E.2d at 294. RCJC actively recruited to fill staff positions

to resolve understaffing problems.  The staff exercised at least some degree of care when they monitored the cameras for each pod from the duty station and conducted checks of the pod twice an hour.  And, Cain called for help immediately when the fight broke out and a squad of deputies entered Pod 3F just over a minute later.  All these facts undermine any claim that the deputies and Irving acted with gross negligence or with indifference to Winn's safety.

Additionally, beyond the understaffing issues and non-direct supervision model, Winn asserts that removing the computers and monitoring stations from the in-pod deputy stations contributes to gross negligence.  But removing that in-pod technology did not remove video monitoring of the pods entirely, it just moved the deputy monitoring station from inside the pods to a centralized duty station in the hallway outside the pods.  The staff assigned to the deputy stations on each floor still continuously monitored the inmates by video feed.  The Court, therefore, will grant the motion for summary judgment on Count V.

### E. Willful and Wanton Negligence (Count VI)[18]

To prove a willful and wanton negligence claim, the plaintiff must show that the defendant acted "consciously in disregard of another person's rights or act[ed] with reckless indifference to the consequences." *Riddick v. Watson*, 503 F. Supp. 3d 399, 425 (E.D. Va. 2020) (quoting *Cowan*, 268 Va. at 486–87, 603 S.E.2d at 918–19).  The defendant must be "aware, from [her] knowledge of existing circumstances and conditions, that [her] conduct probably would cause injury to another." *Cowan*, 268 Va. at 487, 603 S.E.2d at 919.  "Willful and wanton conduct involves an even greater degree of culpability than gross negligence.  A plaintiff that fails to prove gross

---

[18] In Winn's Complaint, his claim for willful and wanton negligence (Count VI) follows his *respondeat superior* claim (Count V).  For clarity, the Court considers these claims in a different order than presented in the Complaint.

negligence has, by definition, failed to prove willful and wanton conduct." *Cantrell v. McCoy*, 553 F. Supp. 3d 295, 307 (W.D. Va. 2021).

Because Winn's gross negligence claim fails, his wanton and willful negligence claim fails, too. The Court, therefore, will grant the motion for summary judgment on Count VI.

### F. Vicarious Liability/Respondeat Superior (Count V)

A plaintiff may hold an employer responsible for the torts of its employees under the doctrine of *respondeat superior* when "*the service itself*, in which the tortious act was done, was within the ordinary course of the employer's business, meaning when the employee committed the tort while performing a normal function of his assigned job." *Our Lady of Peace, Inc. v. Morgan*, 297 Va. 832, 844, 832 S.E.2d 15, 23 (2019) (internal citations omitted). Such liability "may also attach to Virginia sheriffs with respect to the tortious conduct of his or her deputies." *Riddick*, 503 F. Supp. 3d at 427.

Here, Winn does not allege that the deputies working under Irving committed any such tortious conduct apart from the gross negligence and willful and wanton negligence that the Court already addressed above. Winn also does not single out specific deputies in his filings that could have committed a tortious act against him. The Court, therefore, will grant the motion for summary judgment on Count V.

### III. CONCLUSION

Because the record does not support that Winn suffered a constitutional violation or that Irving or the deputies acted with sufficient culpability to meet the requirements of any of his

claims, the Court will grant Irving's motion for summary judgment on Counts I–VII.[19]  (ECF No. 37).

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.


Date: __11 June__ 2025
Richmond, VA

                                        /s/
                                        John A. Gibney, Jr.
                                        Senior United States District Judge

---

[19] Again, Count VII, which asks for punitive damages, does not amount to a standalone claim, and the Court will not award punitive damages because all of Winn's other claims fail.